PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-1318
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

DAVID GROBER
_____

No. 09-2120
_____

UNITED STATES OF AMERICA

v.

DAVID GROBER,
                                        Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Crim. No. 2-06-cr-00880-001)
District Judge:  Honorable Katharine S. Hayden
_____

Argued: June 29, 2010
_____

Before: SLOVITER, BARRY and HARDIMAN, <u>Circuit Judges</u>

(Opinion Filed: October 26, 2010)
_____

George S. Leone, Esq.
Caroline A. Sadlowski, Esq. (Argued)
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Counsel for Appellant/Cross-Appellee


Peter Goldberger, Esq. (Argued)
50 Rittenhouse Place
Ardmore, PA 19003-2276

Counsel for Appellee/Cross-Appellant

_____

OPINION OF THE COURT
_____

BARRY, Circuit Judge

It is an unassailable proposition that "[c]hild pornography harms and debases the most defenseless of our citizens." *United States v. Williams*, 553 U.S. 285, 307 (2008). We believe that, and the District Court believed that. Nonetheless, the Court was deeply concerned about the sentence the government said the Court should impose on defendant David Grober under the child pornography Guidelines. It recognized, on the one hand, the tension between a mechanical application of those Guidelines and the "outrageously high" sentence – indeed, the "truly remarkable punishment" – of 235-293 months of imprisonment they advised, and, on the other, a fair and reasonable sentence that does justice. Determined to take a long and hard look at the child pornography Guidelines in an effort to understand why Congress and the Sentencing Commission did what they did and whether it made sense both as an objective matter and as to the defendant, the Court embarked on a careful study of how the

Guidelines range urged on it by the government came to be. It took evidence over twelve days, heard extensive oral argument and considered extensive written submissions, and rendered a lengthy oral opinion at sentencing and a forty-six page written opinion thereafter explaining in great detail how it arrived at what it believed to be the correct sentence for this defendant. All of this is to be much admired.

There is a flip side, however, when a district court devotes such an extraordinary amount of time and attention to an issue so clearly troubling it and so freely expresses its concerns on the record, reaching out for whatever might assist it in assuaging those concerns. The flip side is this: in the unusual case, such as this, in which a district court arguably does too much rather than too little, there is much more grist for the mill, as here the government points to everything the District Court did and did not do and everything it should and should not have done. After this microscopic examination – but without ever challenging the substantive reasonableness of the ultimate sentence imposed – the government has found what it describes as procedural error. We will affirm.

## I. Background

In December 2005, acting on a tip from America Online regarding child pornography attached to emails involving David Grober's account, law enforcement officers of the State of New Jersey executed a search warrant at Grober's home and discovered what was eventually determined to be approximately 1500 images and 200 videos of child pornography among an even larger collection of adult pornography. In October 2006, a federal grand jury returned an indictment charging Grober with one count of receiving and distributing child pornography and one count of possessing child pornography. Grober was offered a plea to possession only, and he declined, as he had also done pre-indictment.

3

In September 2007, two weeks before the scheduled trial date and after plea negotiations had broken down, a superseding indictment was returned, charging Grober with two counts of transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1); three counts of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); and one count of possessing material containing images of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). On October 4, 2007, Grober pled guilty to all six counts without a plea agreement, admitting that on July 9, 2005, he sent an email containing a video of child pornography (Count One); on July 27, 2005, he received an email containing an image of child pornography (Count Two), and sent back an email containing approximately seventeen images of child pornography (Count Three); on August 16, 2005, he received two separate emails, each containing an image of child pornography (Counts Four and Five); and in December 2005, he collected images and videos containing child pornography from the Internet and stored and possessed this material on computer hard drives and compact discs (Count Six).

Under U.S.S.G. § 2G2.2(a)(2), Grober's base offense level (after grouping) was 22, which, with a criminal history category of I, resulted in a Guidelines range of 41-51 months imprisonment. With the enhancements to § 2G2.2 that appeared applicable, however, Grober's offense level increased to 40. The eighteen levels of enhancements were comprised of two levels for material involving prepubescent minors or minors under age twelve (§ 2G2.2(b)(2)); five levels for distributing material to receive a thing of value, but not for pecuniary gain (§ 2G2.2(b)(3)(B)); four levels for material portraying sadistic or masochistic conduct or other depictions of violence (§ 2G2.2(b)(4)); two levels for the use of a computer (§ 2G2.2(b)(6)); and five levels for possessing more than six hundred images of child pornography (§ 2G2.2(b)(7)(D)). After a two-level downward adjustment for acceptance of responsibility under § 3E1.1(a), Grober's offense level became 38 and his advisory Guidelines range became 235-293 months

imprisonment, a range that it is undisputed was correctly calculated and that even our dissenting colleague does not argue was not "draconian." (Dissent at 17, 21).

The District Court, clearly troubled by the sentence of imprisonment that this Guidelines range produced, held hearings over twelve days between July and December 2008. Numerous witnesses testified – Special Agent Michell Chase, who examined Grober's child pornography collection; Professor Douglas Berman, a law professor proffered by the defense as an expert on the Guidelines over vigorous government objection; several mental health professionals; and the mother of two boys who had been sexually abused and featured in pornography found in Grober's collection. The Court also reviewed in open court a selection of fourteen images and ten videos provided by the government in support of the § 2G2.2 enhancements, as well as victim impact statements.

On December 8, 2008, the District Court held the final (thirteenth) day of hearings. Grober and his family and some friends addressed the Court and the Court heard extensive argument, after which it sentenced Grober to the mandatory minimum sentence of five years imprisonment, as well as three years of supervised release. The Court explained why it had done what it did and subsequently issued a lengthy opinion in support of the sentence, describing its efforts to "actively seek[] some rationale for the harsh sentence" recommended by the Guidelines and advocated by the government. *United States v. Grober*, 595 F. Supp. 2d 382, 390 (D.N.J. 2008). It noted that the government had declined to produce a witness, such as a representative from the Sentencing Commission, to discuss the basis for § 2G2.2, and that it found Professor Berman's testimony to be helpful. "It was through Professor Berman's testimony," the Court explained, "that [it] initially gained an understanding of the role Congress has played in the increased penalties for child exploitation offenses and how intertwined the guidelines for child exploitation offenses have become with various pieces of legislation." *Id*. at 391. The Court considered

5

as well a paper written by an assistant federal public defender, Troy Stabenow, entitled *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, that criticized § 2G2.2.

The District Court also examined a handful of district court opinions that had expressed concern about the child pornography Guidelines and had found that those Guidelines were not based on empirical data. *See United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008); *United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wis. 2008); *United States v. Shipley*, 560 F. Supp. 2d 739 (S.D. Iowa 2008). The Court agreed with those courts that "§ 2G2.2 leads to a sentence that is too severe in a downloading case." *Grober*, 595 F. Supp. 2d at 394. It concluded:

> To review, then, the Court has learned that actual working judges have decided to give these child pornography guidelines less weight in downloading cases; an experienced law professor with a widely used sentencing blog has been unable to probe the Commission's thinking why it sentences downloaders this way; and an influential article makes persuasive arguments against the rationality of § 2G2.2 in downloading cases. Also, reported cases demonstrate that bad people involved with child pornography can get long sentences without using § 2G2.2 as the basis.

*Id.* at 397.

The District Court discussed several additional reasons why it believed § 2G2.2 to be flawed. First, it found that most of the enhancements are essentially inherent in the crime and, thus, apply in nearly every case. Special Agent Chase testified that, of the 180 investigations she had conducted, every one involved 600 or more images, the use of a computer, and a

6

prepubescent minor, and eighty percent had at least one image depicting sado-masochistic conduct. When the enhancements are added to the base offense level of 22 – increased from 17 in 2004 – the Guidelines, in the Court's view, produced "an outrageously high sentence." *Id*. Second, the Court found that the enhancements promote sentencing disparities. It stated that in 2006, the median prison term for federal child pornography offenses was sixty-three months imprisonment, indicating that sentencing courts were imposing significant sentences, but not as high as recommended by § 2G2.2. The Court expressed concern that the government's charging discretion and plea negotiations unfairly affect defendants such as Grober who do not initially plead guilty, and compared Grober to another defendant it had sentenced to thirty months imprisonment for possession of child pornography after he pled guilty without delay and pursuant to a plea agreement. Because of intervening changes to the Guidelines and Grober's initial decision to go to trial, Grober's Guidelines range was over two hundred months higher than the earlier defendant's. Third, the Court described how, given the nature of child pornography, it can be very difficult for the defense to rebut the government's characterization of the egregiousness of a defendant's conduct or dispute the government's evaluation of the defendant's collection compared to the collections of others, both of which may bear on the applicability of § 2G2.2's enhancements.

Thus, the District Court held that the sentencing range § 2G2.2 recommended for Grober would not be applied. Although it recognized "the importance of the guidelines to a rational sentencing protocol," it was "convinced that for a typical downloading case, which this one assuredly is, the applicable guideline, § 2G2.2, cannot be given deference and produces an unreasonable sentencing range even before considering the sentencing factors in [18 U.S.C.] § 3553(a)." *Id.* at 402. The Court found that "Grober's case is squarely within the heartland of downloading cases. Instead it is truer to say that

§ 2G2.2, the designated guideline for the typical downloading case, is what falls outside of the heartland." *Id.* at 403.[1]

The District Court then carefully considered the sentencing factors set forth in 18 U.S.C. § 3553(a) as applied to Grober. It first discussed the nature and circumstances of the offense, finding that Grober's core conduct was consumption of child pornography and that there was no evidence that he had engaged in any improper conduct with a child. The Court made clear that it did not "minimize what David Grober did, or his towering insensitivity to the underlying acts portrayed, or the concept that voyeurs re-victimize the children in the images by looking at them," while also acknowledging that it "cannot make Grober a surrogate for the monsters who prey on child victims through actual contact." *Id.* at 404. The Court was impressed by Grober's history and characteristics, noting the immense support he had continuously received from his family, friends, neighbors, and rabbi.

---

[1]

This is more than a "typical downloading case," and we understand the District Court to have been referring to it in that manner as a form of shorthand. Grober's shorthand for "downloading" in terms of his case is somewhat more accurate: a case "centering on personal possession of illicit images obtained on line, and involving no production or distribution other than noncommercial bartering." (Grober's Second-Step Br. at 48.) Here, as our dissenting colleague recognizes, the noncommercial bartering consisted of Grober sending and receiving a handful of emails that contained depictions of child pornography. While the Court recognized, as do we, that Grober pled guilty to the offenses of receipt and transportation of child pornography, which Congress has chosen to penalize more severely than possession, Grober is not in any sense a large-scale distributor of child pornography; indeed, the dissent references Grober's admission to "sending two e-mails containing eighteen images." (Dissent at 10).

With respect to the seriousness of the offense, the District Court considered the victim impact testimony given by the mother of two boys abused in images that Grober possessed. The Court found that a prison sentence of five years, the mandatory minimum sentence, affords adequate specific and general deterrence, as it would send a clear message about "how catastrophic the consequences are to those who download child pornography." *Id.* at 409. It next concluded that, based on the testimony of the mental health professionals, "Grober presents a very low risk of harm to society" and there is no real risk that he would physically abuse children in the future. *Id.* at 409-10. The Court also noted that Grober appeared to have benefitted greatly from therapy – therapy which addressed, among other things, the fact that he had been sexually abused as a child. In terms of avoiding sentencing disparities, the Court considered average sentences imposed in other child pornography cases. Finally, considering § 3553(a)'s admonition that sentences be "sufficient but not greater than necessary," the Court found, "as a matter of conscience," that any term of imprisonment above the five-year mandatory minimum would be "unfair and unreasonable." *Id.* at 411-12.

The government appealed, and Grober cross-appealed. The government argues that the District Court committed procedural error by not adequately addressing its arguments before rejecting the sentencing range § 2G2.2 recommended for Grober. Importantly, the government does not argue that the Court lacked the authority to disagree with § 2G2.2 on policy grounds or that the sentence the Court imposed is substantively unreasonable. Grober argues that the District Court incorrectly believed that it was required to impose the statutory mandatory minimum sentence.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

We review sentences for abuse of discretion, and review them for both procedural and substantive reasonableness. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). Where a claim of procedural unreasonableness has been made, we must ensure "that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). For a sentence to be procedurally reasonable, a district court must demonstrate "meaningful consideration of the relevant statutory factors and the exercise of independent judgment," *United States v. Grier*, 475 F.3d 556, 571-72 (3d Cir. 2007) (en banc), and "respond to colorable arguments with a factual basis in the record," *United States v. Merced*, 603 F.3d 203, 224 (3d Cir. 2010). A major variance from the Guidelines requires a more significant justification than a minor one. *Gall*, 552 U.S. at 50. We will affirm a procedurally sound sentence as substantively reasonable "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Tomko*, 562 F.3d at 568. "Our responsibility on appellate review of a criminal sentence is limited yet important: we are to ensure that a substantively reasonable sentence has been imposed in a procedurally fair way." *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008).

The government does not challenge the District Court's authority to vary, as the Court did, from the advisory Guidelines range based on its policy disagreement with § 2G2.2, nor does the dissent. *See Spears v. United States*, -- U.S. --, 129 S. Ct. 840, 843 (2009) (per curiam); *Kimbrough v. United States*, 551

U.S. 85, 91, 101 (2007).[2]  When a district court does so, however, it must provide "a reasoned, coherent, and sufficiently compelling explanation of the basis for [its] disagreement." *Merced*, 603 F.3d at 220 (internal quotation marks and citation omitted) (finding procedural error in the district court's failure to adequately explain its apparent policy disagreement with the Guidelines' career offender provision).  We explained in *Merced* that

> [a] "sufficiently compelling" explanation is one that is grounded in the § 3553(a) factors.  The authors of the Guidelines, no less than district courts, have been tasked with ensuring that criminal sentences meet the goals of sentencing set forth in § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007) (explaining that "both the

---

[2]

Other courts of appeals have held that *Kimbrough* and *Spears* apply to policy disagreements with Guidelines outside of the crack cocaine context.  *See, e.g.*, *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject *any* Guideline on policy grounds – though they must act reasonably when using that power."); *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("[D]istrict courts may 'vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines'" (quoting *Kimbrough*, 552 U.S. at 101)); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("As the Supreme Court strongly suggested in *Kimbrough*, a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."); *United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir. 2008) ("[*Kimbrough*] makes plain that a sentencing court can deviate from the guidelines based on general policy considerations.").

sentencing judge and the Commission . . . carry out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale."). Thus, the Guidelines reflect the Sentencing Commission's "rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* at 350. If a district court concludes that those objectives are not achieved by a sentence within the . . . Guideline range, and that belief is driven by a policy disagreement with the [particular Guidelines] provision, then the court must explain why its policy judgment would serve the § 3553(a) sentencing goals better than the Sentencing Commission's judgments. In doing so, he should take into account all of the sentencing factors, not just one or two of them in isolation. We require this explanation so that, on appeal, we can determine whether the court's disagreement is valid in terms of the § 3553 factors, the Sentencing Guidelines, and the perception of fair sentencing.

*Id.* at 221 (select internal quotation marks, citation, and alterations omitted). The explanation must be "thorough" and more than a "conclusory statement of personal belief." *Id.* (citations omitted); *see also United States v. Lychock*, 578 F.3d 214, 220 (3d Cir. 2009) ("To the extent that [the district court's] assertions reflect a policy disagreement with the Guidelines recommendations, such a disagreement is permissible only if a [d]istrict [c]ourt provides 'sufficiently compelling' reasons to justify it." (quoting *Gall*, 552 U.S. at 50)); *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007).

Additionally, the Supreme Court has indicated that "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case." *Kimbrough*, 551 U.S. at 109 (internal quotation marks and citation omitted); *see also*

*Spears*, 129 S. Ct. at 843 (stating that *Kimbrough* implies that an "'inside the heartland' departure . . . may be entitled to less respect"). Notably, the *Kimbrough* Court concluded that "closer review" there was unnecessary because the crack cocaine Guidelines at issue "do not exemplify the Commission's exercise of its characteristic institutional role." 552 U.S. at 109.3 Similarly here, as we will describe, the Commission did not do what "an exercise of its characteristic institutional role" required – develop § 2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress.

## III. Was Procedural Error Committed?

The government is explicit: it is not arguing substantive reasonableness on this appeal, *i.e.*, it does not oppose the sentence itself – five years imprisonment. Rather, its argument as to "the issue" before us is one of procedural error only: "Whether the District Court committed numerous procedural errors when it categorically rejected U.S.S.G. § 2G2.2 without adequately addressing the government's well-supported arguments about the rationales of Congress and the Sentencing Commission, which are embodied in the Guideline."

---

3

In *Kimbrough*, the Supreme Court found that the Sentencing Commission did not use its typical empirical approach in developing the crack/powder cocaine Guidelines, but instead modeled those Guidelines on the Anti-Drug Abuse Act of 1986's ratio scheme that treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine with respect to mandatory minimum sentences. The Commission later determined, "[b]ased on additional research and experience with the 100-to-1 ratio," that the disparity "fails to meet the sentencing objectives set forth by Congress . . . ." *Kimbrough*, 552 U.S. at 97 (citation omitted).

13

(Government's First-Step Br. at 1.)[4]  We will first discuss the District Court's recognition of the rationale behind the penalties for child pornography offenses and its consideration of the government's arguments in support of § 2G2.2, and then describe various court decisions and Sentencing Commission reports that issued after the Court's decision in this case and support the Court's analysis.  As we will explain, we conclude that the Court adequately considered the government's arguments and set forth a sufficiently compelling justification for the sentence it imposed.  We will then discuss some of the specific procedural errors alleged by the government and echoed by the dissent.  While we agree that the Court erred in some respects, we do not find any significant procedural error warranting remand.

## A.     The District Court Adequately Addressed the Government's Arguments Regarding the Rationale for § 2G2.2

It is clear, and the government does not argue otherwise, that the District Court properly calculated the Guidelines range, treated that range as advisory, fully considered the § 3553(a) factors as applied to Grober, and did not base its sentence on any clearly erroneous facts.  *See Gall*, 552 U.S. at 51.  The Court explained at great length, both at sentencing and in its written opinion, the reasons it was concerned about § 2G2.2 in general and as applied to Grober in particular, and why it selected the sentence it did.

---

[4]

Parenthetically, we do not understand the government to mean by its use of the word "rejected" that the District Court did not consider § 2G2.2.  Rather, we understand the government to be arguing that the Court rejected the sentencing range § 2G2.2 recommended for Grober without adequately addressing the government's arguments, an argument belied by a reading of the record and the Court's oral and written sentencing opinions.

14

As its primary contention, the government faults the District Court for not "adequately addressing" its arguments about the rationale behind § 2G2.2, *i.e.*, the rationale for the penalties § 2G2.2 counseled, but clarifies that it "does not argue that the District Court here was too terse, but instead that the reasons it did provide were erroneous." (Fed. R. App. P. 28(j) letter, April 16, 2010.) And it tells us, in its briefing, that "every single reason proffered by the Court for rejecting [§ 2G2.2's advisory sentencing range] was wrong" and "[t]herefore the Court procedurally erred in declining to consider those guidelines." (Government's Third-Step Br. at 2.) But if all of the reasons were wrong, *a fortiori* the Court considered § 2G2.2 and the government simply disagrees with what the Court said.

That, it seems to us, does not fit neatly into a claim of procedural unreasonableness. Indeed, to the extent there is such a thing as a "typical" procedural unreasonableness challenge, that challenge would be to a sentencing proceeding in which a district court *failed* to explain its reasoning, certainly not the case here. *See*, *e.g.*, *Merced*, 603 F.3d at 211; *Lychock*, 578 F.3d at 219; *Goff*, 501 F.3d at 262. Even accepting the government's characterization of the issue before us, the District Court did not commit "significant procedural error." *Gall*, 552 U.S. at 51.

While it is fair to say that the District Court could have said more in direct response to the government's arguments highlighting the rationale behind the Guidelines, there can be no doubt from the thousands of pages of transcript and briefing and opinion that the Court considered these arguments.[5] It clearly

---

[5]

Although the government criticizes the District Court for quoting opinions where courts had "been unable to locate any particular rationale for [§ 2G2.2's enhancements] beyond the general revulsion that is associated with child exploitation-related offenses," the Court did not itself find that there was no rationale supporting the Guidelines. *See Grober*, 595 F. Supp.

15

recognized the concept that abused children are re-victimized whenever the records of their abuse are viewed, *Grober*, 595 F. Supp. 2d at 404, and described the statements of the mother who testified that "her children become 'victims again'" every time the images of their abuse are viewed, *id.* at 408. The Court also explicitly noted that Congress established the mandatory minimum sentence for receipt and transportation of child pornography "on the basis that the exchanging through trading images contributes to the growth of child pornography and harms increasing numbers of children." *Id.* at 404. Thus, the government's suggestion at oral argument before us that the Court failed to acknowledge that Congress increased penalties "because the market for child pornography, as it increases, creates more harm to children by creating more images of child pornography" (Oral Arg. Tr. at 25), or, stated differently, that increased penalties for those who receive and transport child pornography will decrease the demand for and, thus, the production of child pornography, is directly belied by the Court's opinion in this case. The Court also noted an additional harm, albeit one not at issue in this case, that "[C]ongress sought to punish: the seduction and blandishment of children into being victimized by using computer images." *Grober*, 595 F. Supp. 2d at 404. The Court understood and adequately acknowledged the rationale behind the child pornography penalties and does not, as the government urges, need to "start from scratch." (Oral Arg. Tr. at 10.)[6]

---

2d at 392 (quoting *Shipley*, 560 F. Supp. 2d at 744); *id.* at 393 (quoting *Johnson*, 588 F. Supp. 2d at 1003).

[6]

We have previously described the unspeakable harm suffered by the children featured in these images and the perpetuation of this harm caused by the distribution of the permanent record of their abuse. *Goff*, 501 F.3d at 259-60. Unlike *Goff*, this is not a case where the District Court failed to appreciate the seriousness of the offense.

16

**B.     Subsequent to Sentencing in this Case, the Sentencing Commission Has Issued Reports and Other Courts Have Issued Opinions that Support the District Court's Decision**

It must be remembered that between the time of Grober's plea of guilty in October 2007 and his sentencing in December 2008, the District Court was proceeding in largely uncharted territory. There was very little out there, in large part because district courts were just beginning to see how the then-recent and dramatically escalating features of the Guidelines calculations in child pornography cases would play out in the cases before them, particularly given the fact that, as a result of *United States v. Booker*, 543 U.S. 220, 245 (2005), the Guidelines were no longer mandatory. And so the Court reached out to wherever and whomever it believed could provide the information it needed to sentence Grober appropriately.

The District Court considered, for one thing, the Stabenow paper, which appeared in mid-2008, and Professor Berman's testimony as to it, which confirmed, in the Court's view, the reliability of Stabenow's research. That paper – *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* – comprehensively traced the history of § 2G2.2 and supported, with a fair amount of research, Stabenow's conclusion that § 2G2.2 was seriously flawed, and why. District courts fairly quickly began to seize upon what Stabenow had found because they now had reason to believe that their concerns about § 2G2.2 had some basis in fact. And by December 2008, when sentence was imposed on Grober, district courts were increasingly citing the paper and it had become, as the Court described it, "influential." *Grober*, 595 F. Supp. 2d at 397. Were Stabenow to be an unobjective source, as the government claims that he is, we would not place much, if any, reliance on his paper. We

17

cannot, however, fault the Court for doing so because of the paucity of material available to it at the time.7

Since then, not only have numerous district courts across the country similarly found § 2G2.2 flawed, *see, e.g.*, *United States v. Diaz*, -- F. Supp. 2d --, 2010 WL 2640630 (E.D. Wis. 2010) (collecting cases); *United States v. Riley*, 655 F. Supp. 2d 1298 (S.D. Fla. 2009); *United States v. McElheney*, 630 F. Supp. 2d 886 (E.D. Tenn. 2009); *United States v. Beiermann*, 599 F. Supp. 2d 1087 (N.D. Iowa 2009); *United States v. Phinney*, 599 F. Supp. 2d 1037 (E.D. Wis. 2009),8 but so, too, has the Court of Appeals for the Second Circuit, *United States v. Dorvee*, -- F.3d --, 2010 WL 3023799 (2d Cir. 2010), *reh'g en banc denied* (2d Cir. Aug. 31, 2010). Also supporting the District Court's conclusions is, among other reports, the recently issued Sentencing Commission's Report on the history of the child pornography Guidelines, an extensive and extraordinarily thorough study, indeed. Were any of this available at the time of Grober's sentencing, the Court could even more "adequately" have addressed and disposed of "the government's well-

---

7

It is unnecessary for purposes of this Opinion to parse Stabenow's paper and determine if the government is correct as to the inaccuracies to which it points. Although our dissenting colleague disagrees that such analysis is unnecessary, he does not point to any inaccuracies in the paper. We also note that the Court of Appeals for the Second Circuit has recently cited Stabenow's paper in its opinion critiquing § 2G2.2. *United States v. Dorvee*, -- F.3d --, 2010 WL 3023799, at *9 (2d Cir. 2010), *reh'g en banc denied* (2d Cir. Aug. 31, 2010)..

8

*But see United States v. Cunningham*, 680 F. Supp. 2d 844 (N.D. Ohio 2010) (discussing the history of § 2G2.2 and the Stabenow paper and rejecting the notion that § 2G2.2 should not be afforded deference).

supported arguments" and, likely, would not have needed to consider Stabenow's research or permit the defense to call Professor Berman.[9]

## 1. The Sentencing Commission's Reports and Data

The Sentencing Commission's Report on the history of the child pornography Guidelines – issued in October 2009, almost a year after sentence was imposed in this case – supports the District Court's decision by highlighting Congress's role in developing § 2G2.2 and its laser-like focus on the child pornography Guidelines, particularly in the last several years. *See* United States Sentencing Commission, *The History of the Child Pornography Guidelines* (Oct. 2009), available at http://www.ussc.gov/general/20091030_History_Child_Pornogr

---

[9]

An illustration makes the point rather clearly. In one of the first district court opinions to discuss Stabenow's paper, Judge Lynn Adelman relied almost exclusively on the paper to find that "given all of the flaws in the guideline," and particularly the numerous enhancements the defendant faced, he could not, after considering the § 3553(a) factors, conclude that the guideline range of 210-262 months for a plea to transporting child pornography deserved deference – it was "far greater than necessary to satisfy the purposes of sentencing in this case." *Hanson*, 561 F. Supp. 2d at 1005. In one of the most recent district court opinions, Judge Adelman did not even mention the Stabenow paper, given that he now had, as we describe in text, the 2009 Sentencing Commission's Report on the history of the child pornography Guidelines, the Second Circuit's opinion in *Dorvee*, and a virtual string citation to opinions by judges across the country who have "recogniz[ed] the flaws" in § 2G2.2 and "have declined to impose sentence within the range it recommends." *Diaz*, -- F. Supp. 2d at --, 2010 WL 2640630, at *3.

19

aphy_Guidelines.pdf. The Report describes the development of the child pornography Guidelines, which have been substantively amended nine times since 1987, and repeatedly highlights the role that Congress has played. For example, the Report states that

> Congress has demonstrated its continued interest in deterring and punishing child pornography offenses, prompting the Commission to respond to multiple public laws that created new child pornography offenses, increased criminal penalties, directly (and uniquely) amended the child pornography guidelines, and required the Commission to consider offender and offense characteristics for the child pornography guidelines.

*Id.* at 54; *see also id.* at 1 ("Congress has been particularly active over the last decade creating new offenses, increasing penalties, and issuing directives to the Commission regarding child pornography offenses."); *id.* at 6 ("Through creating new offenses, enacting new mandatory minimums, increasing statutory maximums, and providing directives to the Commission, Congress has repeatedly expressed its will regarding appropriate penalties for child pornography offenders."). The Report states that, in the Commission's effort to "to implement congressional intent," it "reviewed sentencing data, considered public comment on proposed amendments, conducted public hearings on proposed amendments, studied relevant literature, and considered pertinent legislative history." *Id.* at 7. It is clear from the Report, however, that the Commission was constantly reacting to Congress's repeated directives, and the penalties for child pornography offenses that were steadily, and often dramatically, increasing. The result is a Guidelines provision where, as the Commission found, if the base offense level was any higher, the typical offender sentenced for receipt of child pornography would face a higher Guidelines

20

range than the typical offender convicted of conspiracy to commit murder and kidnapping. *Id.* at 47-48.

We will briefly recount some of the history set forth in the Report. When § 2G2.2 was first promulgated by the Commission in 1987, it had a base offense level of 13 – nine levels lower than it is today for transportation, distribution, and receipt offenses – and contained only two enhancements, one for material depicting a child less than twelve years old (two levels) and one for the retail value of the material distributed (at least five levels). The Commission promulgated § 2G2.4 in 1991 to address the then-recently federalized crime of possession, and proposed to set the base offense level at 10 – eight levels lower than it is today – and included only a two-level enhancement for material depicting a prepubescent minor or child under the age of twelve. Members of Congress were vocal in expressing their concern that the Guidelines ranges were not high enough for child pornography offenders – these were "smut peddlers" and "pedophiles" – but the Commission defended the Guidelines, noting that they "continue to require substantially tougher penalties than typically were imposed under pre-guidelines practice" and that data suggested that judges and prosecutors thought "that the offense level for the least serious forms of conduct under § 2G2.2 was too severe." *Id.* at 21. Congress specifically directed the Commission, however, to make a variety of changes to § 2G2.2 and § 2G2.4, including raising the base offense levels to at least 15 and 13, respectively.

In 1995, Congress again specifically directed the Commission to raise the base offense level for child pornography offenses by at least two levels and include at least a two-level enhancement if a computer was used to transport the child pornography. The Commission complied, but expressed concern that the computer enhancement would apply broadly, and without any distinction between offenders who used a computer to widely disseminate child pornography and those who "email[ed] images to a single voluntary recipient." United States Sentencing Commission, *Report to the Congress: Sex*

21

*Offenses Against Children* at 30 (June 1996), available at http://www.ussc.gov/r_congress/SCAC.pdf. This Report to Congress also noted significant downward departure rates (for reasons other than substantial assistance) for sentences imposed under the child pornography Guidelines: 23% under § 2G2.2 and 13% under § 2G2.4.

In 2003, Congress, apparently without seeking any input from the Commission, which, of course, it was not required to do, passed the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act"), which resulted in several significant changes to the child pornography statutes and Guidelines, including "the first and only time to date [Congress] directly amended the guidelines." *The History of the Child Pornography Guidelines* at 38. As the Second Circuit recently noted, the former United States Attorney for the Eastern District of New York described this statute as "the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress." *Dorvee*, -- F.3d --, 2010 WL 3023799, at *9 (quoting Alan Vinegrad, *The New Federal Sentencing Law*, 15 Fed. Sent'g Rep. 310, 315 (June 2003)).

The PROTECT Act added the "image table" to both § 2G2.2 and § 2G2.4 which raised the offense level based on the number of images at issue, ranging from a two-level increase for at least ten images to a five-level increase for 600 or more images. It additionally added to § 2G2.4 a four-level increase for material portraying sadistic or masochistic conduct or other depictions of violence (which the Commission included in § 2G2.2 in 1990). The Act also added a five-year mandatory minimum sentence for receipt and trafficking, and raised the statutory maximum from fifteen to twenty years for receipt and trafficking and from five to ten years for possession. The Act included general directives to the Commission to review the Guidelines, and in response, the Commission conducted several studies. The Commission concluded, for example, that the new

amendments would more than double the average sentences under § 2G2.2 (from 42.8 months to 88.8 months) and nearly double the average sentences under § 2G2.4 (from 28 months to 54 months).

Effective November 1, 2004, the Commission again amended the Guidelines, consolidating § 2G2.4 into § 2G2.2. In response to the new minimum and maximum penalties set by Congress, the Commission set higher base offense levels for possession (increased from 15 to 18) and trafficking/distribution (increased from 17 to 22). The Report indicates that these offense levels were set below the mandatory minimum because "a majority of offenders sentenced under § 2G2.2 were subject to specific offense characteristics that increased their offense level." *The History of the Child Pornography Guidelines* at 46 (citing the enhancements for computer use and material involving a prepubescent child, to which, at the time, 89.4% and 91.4% of offenders, respectively, were subject).[10] The Commission was "concerned that setting the base offense level any higher than 22 for trafficking and receipt offenses would affect the proportionality of other guidelines," and, could, for example, call for a higher penalty than that typically imposed on a defendant convicted of conspiracy to commit murder and kidnapping. *Id.* at 47-48.

Importantly, the 2009 Report notes that the Commission has identified a review of the child pornography Guidelines as a policy priority, and that "[f]or the past several years, § 2G2.2 has had a high and increasing rate of downward departures and below-guideline variances." *Id.* at 8, 54. Sentencing data bears

---

[10] These percentages have only increased. In 2009, 97.2% of offenders sentenced under § 2G2.2 were subject to the computer enhancement and 94.8% were subject to the prepubescent material enhancement. *Dorvee*, -- F.3d at --, 2010 WL 3023799, at *10.

out this observation. In fiscal year 2008, 35.7% of § 2G2.2 sentences were non-government-sponsored below-Guidelines sentences, compared to 13.4% of such sentences for all offenders. *Id.* at 8 n.33. In fiscal year 2009, the percentage is even higher: 43.03% of § 2G2.2 sentences were non-government-sponsored below-Guidelines sentences, compared to 15.9% of such sentences for all offenders. United States Sentencing Commission, *2009 Sourcebook of Federal Sentencing Statistics*, Tables 28 & N, available at http://www.ussc.gov/ANNRPT/2009/SBTOC09.htm. It bears mention, as well, that the Commission recently surveyed federal district court judges regarding their experience with, and opinions of, *inter alia*, the child pornography Guidelines, and found widespread dissatisfaction with § 2G2.2. United States Sentencing Commission, *Results of Survey of United States District Judges January 2010 through March 2010* (June 2010), available at ttp://www.ussc.gov/Judge_Survey/2010/JudgeSurvey_201006.pdf. Seventy percent of responding judges – and only judges who had sentenced defendants after *Kimbrough* and *Gall* were to respond to the questions with respect to § 2G2.2 – reported that the Guidelines range for possession was too high, 69% said that the range for receipt was too high, and 30% believed that the range for distribution was too high.

### 2. The Second Circuit's Decision in *United States v. Dorvee*

We return to *United States v. Dorvee*, a recent and important decision albeit one not addressed by the dissent, in which the Second Circuit concluded that § 2G2.2 is "fundamentally different" from other Guidelines and, unless it is "applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." -- F.3d at --, 2010 WL 3023799, at *9. Holding that a 233-month within-Guidelines sentence for the distribution of child pornography was both procedurally unreasonable (on grounds not relevant here) and substantively unreasonable because it was "manifestly

24

unjust," *id*. at 98, the Court largely echoed the District Court here. It found that the Commission did not use an empirical approach to develop § 2G2.2, but instead amended it repeatedly at the direction of Congress, sometimes reluctantly. *Id.* at 95-96 (noting the Commission's criticism of the two-level enhancement for use of a computer and its general statement that "specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress" (quoting United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 73 (2004), available at http://www.ussc.gov/15_year/chap2.pdf).

The enhancements "cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." *Dorvee*, -- F.3d at --, 2010 WL 3023799, at *10. The *Dorvee* Court noted, as did the District Court here, that many of these enhancements apply in almost all cases. *See id.* (noting that, of all the § 2G2.2 sentences imposed in 2009, 94.8% involved an image of a prepubescent minor, 97.2% involved a computer, 73.4% involved an image of sadistic, masochistic, or otherwise violent conduct, and 63.1% involved 600 or more images); *see also United States v. Tutty*, 612 F.3d 128, 132 (2d Cir. 2010) (noting that 96.6% of offenders sentenced under § 2G2.2 in 2009 received an enhancement based on the number of images possessed). Thus, "[a]n ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction." *Dorvee*, -- F.3d at --, 2010 WL 3023799, at *10. Because the Guidelines do not distinguish between these "run-of-the-mill" offenders and the most dangerous offenders, the "result is fundamentally incompatible with § 3553(a)." *Id.* The *Dorvee* Court further cited as proof of the "irrationality" of §

25

2G2.2 that a defendant who actually engages in sexual conduct with a minor may be subject to a lower Guidelines range than one who distributes child pornography. *Id.*

For these reasons, the Second Circuit concluded that this "eccentric Guideline of highly unusual provenance" is not worthy of the weight afforded to other Guidelines. *Id*. at \*12; *see also Tutty*, 612 F.3d at 133 (vacating 168-month within-Guidelines sentence for receipt of child pornography and directing district court on remand to consider the policy considerations identified in *Dorvee*); *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) ("[W]e wish to express our view that [§ 2G2.2 is] in our judgment harsher than necessary. . . . [F]irst-offender sentences of this duration are usually reserved for crimes of violence and the like.").

**C.   Section 2G2.2 Was Not Developed Pursuant to the Sentencing Commission's Characteristic Institutional Role**

We have recognized that "a Guideline is likely to reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives only when it is the product of empirical data and national experience, guided by a professional staff with appropriate expertise." *United States v. Arrelucea-Zamudio*, 581 F.3d 142, 155 n.12 (3d Cir. 2009) (internal quotation marks and citations omitted) (concluding that Sentencing Commission implemented Guideline authorizing departure for "fast track" programs in illegal reentry cases at congressional direction and not based on empirical data and national experience). In *Kimbrough*, the Supreme Court analyzed the crack cocaine Guidelines, and held that they were based on statutory mandatory minimum sentences rather than "empirical data and national experience" and, thus, the Commission had not exercised its "characteristic institutional role" in developing them. 552 U.S. at 109 (citation omitted). A district court would not, therefore, abuse its discretion by concluding that a within-Guidelines sentence would not meet the sentencing purposes set

out in § 3553(a), even in a typical case. *See Stone*, 575 F.3d at 93 (noting that *Kimbrough* "recognized the fact that the crack cocaine guidelines were based on congressional policy, rather than empirical study by the Commission, as one ground permitting a variant sentence").

As described in the Commission's 2009 Report, and as discussed by the Second Circuit in *Dorvee*, and, by now, numerous district courts, § 2G2.2 was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives. *See Dorvee*, -- F.3d at --, 2010 WL 3023799, at *11 (concluding that § 2G2.2 does not "exemplify the Commission's exercise of its characteristic institutional role" (quoting *Kimbrough*, 552 U.S. at 109-10)); *United States v. Huffstatler*, 571 F.3d 620, 622-23 (7th Cir. 2009) ("[P]erhaps for good reason, the government did not take issue with [the] premise that the child-exploitation guidelines lack an empirical basis" since the Commission acknowledged that Congress has used a combination of mandatory minimum increases and directives to the Commission to change child pornography sentencing policy.).11  As one district court put it, "the Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts." *Diaz*, -- F. Supp. 2d at --, 2010 WL 2640630, at *7.

Congress, of course, has retained the ultimate authority over the Guidelines, and may enact directives to the Commission which the Commission is obliged to implement. Nonetheless, *Kimbrough* permits district courts to vary "even where a guideline provision is a direct reflection of a

---

11

*But see United States v. Pugh*, 515 F.3d 1179, 1201 n.15 (11th Cir. 2008) (stating that § 2G2.2 does not "exhibit the deficiencies the Supreme Court identified in *Kimbrough*").

congressional directive." *Arrelucea-Zamudio*, 581 F.3d at 150 (quoting *Stone*, 575 F.3d at 89); *see also id.* at 151 ("In sum, a Guideline is not a statute. If Congress does not want district courts to exercise their judicial function to sentence defendants based on the facts and circumstances of each case under the guidance of the § 3553(a) factors, then it has the power to amend the pertinent statute.").

**D.      The District Court Provided a Sufficiently Compelling Justification for Not Applying the Sentencing Range Recommended by § 2G2.2**

Nonetheless, the Sentencing Guidelines "deserve careful consideration in each case," and because "they have been produced at Congress's direction, they cannot be ignored." *Goff*, 501 F.3d at 257. Here, after extensive consideration of § 2G2.2 and the § 3553(a) factors, the District Court determined not to apply the Guidelines range recommended by § 2G2.2. This was not an abuse of its discretion. The Court set forth an explanation that we find to be sufficiently compelling, and well-grounded in the § 3553(a) factors, to justify its decision. It adequately explained why it found § 2G2.2 flawed and why it varied from the recommended sentencing range to the ultimate sentence it imposed, which, it bears repeating, the government does not challenge. We also conclude that with the wealth of resources that have become available since the sentencing in this case, the Court's decision now stands on even stronger ground. Finally, although the government does challenge the Court's broad conclusions about § 2G2.2, it does not and cannot argue that the Court did not adequately consider the § 3553(a) factors as applied to Grober, as surely the Court did. (Oral Arg. Tr. at 54 (government stating that it does "not challenge the procedural reasonableness of the Court's examination of Grober's personal factors")).12

---

12

Although our dissenting colleague criticizes the District Court's consideration of the nature and circumstances of the

28

We emphasize that we do not hold that § 2G2.2 will always recommend an unreasonable sentence, and district courts must, of course, continue to consider the applicable Guidelines range. *See* 18 U.S.C. § 3553(a)(4); *Gall*, 552 U.S. at 49 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). Moreover, if a district court does not in fact have a policy disagreement with § 2G2.2, it is not obligated to vary on this basis. *See Arrelucea-Zamudio*, 581 F.3d at 148-49 (citing *United States v. Gunter*, 462 F.3d 237, 249 (3d Cir. 2006)).

---

offense, 18 U.S.C. § 3553(a)(1), the government does not challenge the procedural or substantive reasonableness of this analysis as it applies to Grober.

## Specific Allegations of Procedural Error

We nonetheless agree with the government and the dissent that, at least in certain respects, the District Court procedurally erred. Where we disagree is whether these errors, singly or collectively, are significant enough to warrant remand. We are convinced that they are not. For example, the Court improperly faulted the government for not presenting a live witness, such as a representative from the Sentencing Commission, essentially to defend the child pornography Guidelines. Even aside from the government's argument that this type of inquiry is legally impermissible, as a practical matter, it is unworkable. Additionally, Professor Berman did not demonstrate any particular expertise as to § 2G2.2, as opposed to the Guidelines in general, as to which, we note, the Court found his testimony helpful. In any event, the Federal Rules of Evidence – including those governing the admission of expert testimony – do not apply in sentencing proceedings, *Grier*, 475 F.3d at 570 n.9; Fed. R. Evid. 1101(d)(3); *see also* U.S.S.G. § 6A1.3(a), and it is surely not apparent that any harm came as the result of this testimony. Indeed, our dissenting colleague would not find reversible procedural error on this ground alone. As we said at the outset, the Court sought to engage in a "dialogue" with the Sentencing Commission and defense witnesses about the history of and rationale for § 2G2.2 and considered Stabenow's paper because there was so little out there. That does not mean, however, that the Court did not also rely on the extensive briefing provided by the parties and other available resources, as clearly it did.

The government also challenges the District Court's characterization of Grober as a typical defendant sentenced under § 2G2.2. It argues, first, that, because many child pornography-related cases are for various reasons not prosecuted federally, the typicality of a child pornography offender cannot be determined by looking only at those charged federally. The Court properly focused, however, on defendants sentenced under § 2G2.2 and did not purport to undertake an exhaustive analysis

of offenders who are charged in state court or never charged at all. While, as we observed above at note 1, we agree with the government and the dissent that the Court's description of Grober as a "downloading defendant" does not fully encapsulate the crimes of receipt and transportation of child pornography to which he pled guilty, the Court clearly comprehended the nature of Grober's conduct, and sufficiently addressed the distinct harms caused by his trading images of child pornography.

Finally, we reach what, in the dissent's view, is the "most egregious" error – the District Court's "frontal assault on the plea bargaining system" and, indeed, its "rejection" of that system. (Dissent at 5, 6, 8). The Court did no such thing. In light of the fact that Grober twice had the opportunity to plead guilty to only a possession count and did not do so, his case, to be sure, is distinguishable from that of the "earlier defendant" referenced, perhaps inappropriately, by the Court – the defendant who quickly pled guilty to possession of child pornography. However, insofar as the Court was alarmed by the escalating offense levels implemented between the earlier defendant's guilty plea and Grober's guilty plea, the comparison is apt and illustrates in rather dramatic fashion why the Court was concerned. That having been said, to the extent that the dissent criticizes the Court for "penalizing the Government for its role in the plea bargaining system" (Dissent at 7), it is unclear what "penalty" the Court imposed, except the ultimate sentence which neither the government nor the dissent argues was substantively unreasonable.

Accordingly, we conclude that the District Court did not commit any significant procedural error requiring remand.

## IV. The Cross-Appeal

Grober's cross-appeal need not detain us long. He argues, first, that all six counts of conviction must merge into a single continuing offense of possession to avoid violating the Double Jeopardy Clause, *see United States v. Miller*, 527 F.3d

54, 72 (3d Cir. 2008), and, because the possession crime does not carry a mandatory minimum sentence of imprisonment, that he may be re-sentenced without regard to the five-year minimum required for the other counts of conviction. Even if this argument was not waived by his plea of guilty to all six counts in the superseding indictment, *see United States v. Broce*, 488 U.S. 563, 570 (1989); *United States v. Pollen*, 978 F.2d 78, 84 (3d Cir. 1992), it surely cannot, under the circumstances of this case, survive plain error review.

Grober argues, next, that a district court is not obligated to impose a mandatory minimum sentence that it concludes is greater than necessary to comport with the purposes of sentencing, unless the applicable statutory provision specifically provides that the Sentencing Reform Act does not apply. *See* 18 U.S.C. §§ 3551(a), 3553(a). We have previously rejected this argument in analogous circumstances. *See United States v. Walker*, 473 F.3d 71, 85 (3d Cir. 2007); *United States v. Kellum*, 356 F.3d 285, 289 (3d Cir. 2004). Accordingly, the District Court properly recognized that it was statutorily bound to impose a sentence of at least five years imprisonment in this case.

## V. Conclusion

As we have described, the District Court set forth, in a thoughtful and carefully considered albeit at points imperfect opinion, a sufficiently compelling explanation for its policy concerns about § 2G2.2 and its justification for imposing a sentence outside the range § 2G2.2 recommended. Because the Court did not abuse its discretion in sentencing David Grober to a term of five years imprisonment, we will affirm.

*United States v. Grober*, Nos. 09-1318, 09-2120
HARDIMAN, dissenting in part

I join my colleagues in recognizing the diligence and seriousness of purpose shown by the District Court in sentencing David Grober. I join them also in recognizing that the District Court "erred in some respects." Maj. Op. at 15. Because I am convinced that the procedural errors committed by the District Court are material, however, I must respectfully dissent.[1]

I.

After pleading guilty to six federal crimes, Grober's statutory imprisonment range was 60-240 months. His base offense level was 22 and his criminal history category was I, yielding an initial imprisonment range of 41-51 months under the United States Sentencing Guidelines (USSG). Because he qualified for five sentencing enhancements pursuant to USSG §2G2.2, however, Grober's base offense level rose to 40. After a two-level downward adjustment for acceptance of responsibility, Grober's final Guidelines range was 235-293 months imprisonment, which was capped at 240 months by virtue of the statutory maximum.

Despite the fact that Grober's Guidelines range was aligned with the statutory *maximum*, he was sentenced to the statutory *minimum* of 60 months imprisonment. A variance of this magnitude requires us to "consider the extent of the deviation and ensure that the justification is sufficiently

---

[1] I agree with my colleagues that the cross-appeal is unmeritorious. Therefore, this dissent is limited to the procedural reasonableness of Grober's sentence.

compelling to support the degree of the variance." *United States v. Merced*, 603 F.3d 203, 216 (3d Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).

"The freedom to vary from the . . . Guidelines . . . is not free. Its price is a reasoned, coherent, and sufficiently compelling explanation of the basis for the court's disagreement." *Merced*, 603 F.3d at 219-20 (quoting *United States v. Lychock*, 578 F.3d 214, 220 (3d Cir. 2009)). "A 'sufficiently compelling' explanation is one that is grounded in the 3553(a) factors." *Id.* at 221. Because the Sentencing Commission is charged with effectuating the objectives of § 3553(a), the District Court, in categorically rejecting § 2G2.2, "must explain why its policy judgment would serve the § 3553(a) sentencing goals better than the Sentencing Commission's judgments. In doing so, [the court] should take into account all of the sentencing factors, not just one or two of them in isolation." *Id.*

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), district judges have wrestled with the scope of their sentencing discretion. Although statutory ranges established by Congress still circumscribe this discretion, in many cases (like this one) those ranges are so broad that the potential for unwarranted sentencing disparities looms large. Accordingly, *Booker* and its progeny reflect the Supreme Court's ongoing support for the Guidelines as a critical starting point and frame of reference as judges discharge their most solemn duty: imposing criminal sentences. *See, e.g.*, *United States v. Kimbrough*, 552 U.S. 85, 108 (2007) ("While rendering the Sentencing Guidelines advisory, we have nevertheless preserved a key role for the Sentencing Commission."); *Gall*,

552 U.S. at 49 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."); *cf. Booker*, 543 U.S. at 311 (Scalia, J., dissenting) ("The worst feature of the scheme is that no one knows--and perhaps no one is meant to know--how advisory Guidelines and 'unreasonableness' review will function in practice.").

In view of the Supreme Court's continuing support for the Guidelines, we must ensure that district courts do not evaluate the sentencing factors of 18 U.S.C. § 3553(a) in a way that renders the Guidelines irrelevant. At least two reasons animate this imperative. First, fidelity to *Booker* and its progeny demands it. Second, should the courts of appeals fail to police wildly disparate sentences, I fear that Congress will respond to the evisceration of the Guidelines by prescribing statutory sentencing ranges that will, in their detail, rival the 282 laws of the Code of Hammurabi about which the District Court in this case expressed such consternation.

## II.

In *Kimbrough v. United States*, 552 U.S. 85, 91 (2007), the Supreme Court held USSG § 2D1.1, like all other Guidelines, to be advisory. In light of the uncertainty surrounding the authority possessed by district courts to alter or disregard the 100 to 1 crack/powder ratio, the Court in *Spears v. United States*, 129 S. Ct. 840 (2009), "clarif[ied] that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines." *Id.* at 844. Apparently in light of *Spears*, in this appeal the Government has conceded that district courts

may categorically reject USSG § 2G2.2.[2] Nevertheless, the District Court committed several missteps on its way toward categorically rejecting § 2G2.2, and its wholesale rejection of that Guideline rendered Grober's sentence procedurally unreasonable.

The Majority candidly acknowledges the District Court's errors in: (1) faulting the Government for not presenting a live witness at sentencing to defend § 2G2.2; (2) taking testimony from Professor Douglas Berman who, though an authority on sentencing law and policy, conceded a lack of expertise with

---

[2] The Government's concession here is consistent with *Merced*, where we observed that the notion that a Guideline driven by Congressional mandate is not subject to categorical rejection on policy grounds has fallen out of favor. *Merced*, 603 F.3d at 226. Although the Supreme Court endorsed such a categorical rejection of the crack cocaine Guidelines (*Spears*), I am not convinced the Supreme Court would so hold in respect to the child pornography Guidelines. The storied history of the 100 to 1 crack/powder ratio is *sui generis* in my view. *See United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008) ("The [child pornography] Guidelines involved in Pugh's case, however, do not exhibit the deficiencies the Supreme Court identified in *Kimbrough*."). Rather than blithely assuming that the Supreme Court would permit the categorical rejection of all Guidelines as it did with USSG § 2D1.1, the better practice would be for district courts to consider each Guideline and enhancement on its peculiar merits (or demerits). This approach maintains the best of *Booker* (allowing district courts to do justice) without facilitating such wildly disparate sentences as to invite a Congressional "fix."

4

respect to § 2G2.2; (3) describing Grober as a "downloading defendant"; and (4) comparing Grober to a dissimilar defendant who was sentenced pursuant to a plea agreement. Maj. Op. at 31-32. After briefly explaining away each of these errors, the Majority concludes "that the District Court did not commit any significant procedural error requiring remand." *Id*. at 33.

If the only error committed by the District Court had been to hear testimony from Professor Berman, I would agree with my colleagues. If the District Court had committed only the first, or the third, or the fourth error noted above, we would be presented with a closer case. But when the foregoing errors are considered in the aggregate, as they must be, the District Court committed reversible error.

A.

I begin with the fourth error cited by the Majority because I find it the most egregious. In support of its decision to disregard § 2G2.2, the District Court adverted to "its own experience about the problematic nature of charging discretion and plea arrangements" and likened Grober to an unnamed "earlier defendant" who had pleaded guilty to one count of possession pursuant to a plea agreement. *Grober*, 595 F. Supp. 2d 382, 399 (D.N.J. 2008).

Although much remains unknown about this "earlier defendant," we do know that his crime of conviction was materially different than Grober's. The "earlier defendant" pleaded guilty to one count of possession. Grober, on the other hand, pleaded guilty to six counts (one for possession, three for receipt or distribution, and two for transportation) after rejecting

5

the Government's first two plea offers, which included the dismissal of the receipt and distribution charges. By contrasting the Guidelines range Grober faced with the range faced by the "earlier defendant," the District Court concluded that applying the enhancements recommended by the Probation Office and advocated by the Government would result in sentencing disparities.

But the disparities caused by, to use the District Court's words, "charging discretion and plea arrangements," *Grober*, 595 F. Supp. 2d at 399, are endemic to *all* Guidelines and have nothing to do with § 2G2.2 in particular.[3]  By rebuking the Government for obtaining a superseding indictment after Grober twice rejected the Government's offers, the District Court launched a frontal assault on the plea bargaining system. Irrespective of the subject matter—whether it be child pornography, drugs, securities fraud, or countless other federal crimes—it is unremarkable that the Government tries to cajole the guilty to fess up promptly.  And those who do so are rewarded with fewer or less significant charges, thereby earning them more lenient sentences than those who are convicted after a trial or an eleventh-hour plea.  This is the essence of an imperfect, but long-tenured system that has been endorsed by the Supreme Court.  *See, e.g.*, *Santobello v. New York*, 404 U.S.

---

[3] In *United States v. Arrelucea-Zamudio*, 581 F.3d 142 (3d Cir. 2009), we recognized that defendants who accept plea offers are often subject to lower sentences than those who do not.  *Id*. at 157.  Unlike the court in *Arrelucea*, which was concerned with reducing sentencing disparities among like defendants, here the District Court increased disparity by treating defendants convicted of different offenses similarly.

6

257, 260 (1971) (finding that courts have long considered plea bargaining to be "an essential component of the administration of justice," and if "properly administered, [the procedure should] be encouraged"); *Brady v. United States*, 397 U.S. 742, 752 (1970) (describing the "mutuality of advantage" for both the State and the defendant to plea bargain: "For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious -- his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages -- the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof."); *see also* GEORGE FISHER, PLEA BARGAINING'S TRIUMPH: A HISTORY OF PLEA BARGAINING IN AMERICA (Stanford University Press 2003) (finding that plea bargains were commonplace in criminal trials in the United States as early as 1800); MILTON HEUMANN, PLEA BARGAINING: THE EXPERIENCES OF PROSECUTORS, JUDGES, AND DEFENSE ATTORNEYS (University of Chicago Press 1978) (describing strong support for plea bargaining among prosecutors, defense attorneys, and judges familiar with the system).

In sum, by comparing Grober to the "earlier defendant" who accepted a plea agreement, the District Court impermissibly penalized the Government for its role in the plea bargaining system. This was reversible error.

7

B.

In addition to the District Court's rejection of the plea bargaining system, a significant evidentiary error tainted the sentencing hearing. The District Court challenged the Government to proffer a witness from the Sentencing Commission to justify § 2G2.2 and to counter testimony from Professor Berman regarding federal defender Troy Stabenow's paper: *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (hereinafter *Stabenow*). In the words of the District Court: "[I]insofar as the government might have established a dialogue between Professor Berman and the Commission on the Stabenow research or any other issue Professor Berman testified about, it took a pass. So did the Commission . . . . Hence, despite the Court's invitation and many opportunities, the testimony of Professor Berman is unrebutted by live testimony." *Grober*, 595 F. Supp. 2d at 391. As the Majority correctly noted: "Even aside from the government's argument that this type of inquiry is legally impermissible, as a practical matter, it is unworkable." Maj. Op. at 32.

The Government was right to decline the Court's unorthodox invitation. It would have been no more proper for the Government to have proffered a member of the Sentencing Commission to opine regarding the history and purpose of § 2G2.2 than it would have been to proffer a Senator or Representative to testify regarding the legislative history of the child pornography laws. The Guideline promulgation process is not subject to "discovery." *See, e.g.*, *United States v. Leroy*, 984 F.2d 1095, 1098 (10th Cir. 1993). The Commission so advised the District Court in a letter attached as Appendix A to

8

the Court's opinion, which stated:

> The Act provides, in 18 U.S.C. § 3553(b)(1), that in determining whether a circumstance was adequately taken into consideration by the Commission in formulating the guidelines, "the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." The legislative history of this provision makes clear that Congress limited the court's consideration in this regard to preclude the possibility of legal process directed at the Commission, individual commissioners, or staff in an effort to look beyond the sources specified. *See* 133 Cong. Rec. 31,946 (1987) (statement of Rep. Conyers) ("The purpose of the amendment is to ensure that members of the Sentencing Commission, as well as its records, are not subject to subpoena at the sentencing of a convicted defendant."); 133 Cong. Rec. 33,110 (1987) (statement of Sen. Thurmond) ("There was some concern that failure to specifically designate the materials that may be used . . . could result in members of the Commission, or their notes or other internal work products, being subpoenaed. This was never intended by Congress.").

*Grober,* 595 F. Supp. 2d at 412, app. A.

While the Government did not present live testimony to rebut Berman or Stabenow, it did argue in its briefs that the reasons supporting the creation and evolution of § 2G2.2 were discernible. Although the Majority concludes that the District Court "clearly" relied upon the briefs in this regard, Maj. Op. at 32, I find no record support for this conclusion. Accordingly, I do not share the Majority's view that the District Court truly evaluated and rejected the Government's arguments after due consideration. Indeed, the District Court's pejorative characterization that both the Government and the Commission "took a pass" suggests that the District Court placed nothing on the Government's side of the scale. And *something* outweighs nothing every day of the week.

In its search for *something*, the District Court relied extensively on *Stabenow*, which criticizes § 2G2.2 on several levels. Regarding the District Court's reliance on *Stabenow*, the Majority states: "It is unnecessary for purposes of this Opinion to parse the paper and determine if the government is correct as to the inaccuracies to which it points." Maj. Op. at 19 n.7. I disagree. Because *Stabenow* was foundational to the District Court's decision to disregard § 2G2.2, the Majority should be obliged to engage the Government's arguments to ensure that *Stabenow* is, in fact, "sufficiently compelling" to justify the Court's divergence from the Guideline.

After the District Court knocked down its straw man—*i.e.*, the Government's failure to provide a testimonial defense of § 2G2.2—the only "evidence" that remained was *Stabenow*, which offered an advocate's blueprint for rejecting § 2G2.2 and the "unrebutted" testimony of Professor Berman. In my view, this procedural error was sufficient to warrant vacatur.

10

C.

Next, I turn to the District Court's repeated mischaracterization of Grober's crime as a typical "downloading" offense. In declining to apply any of the detailed enhancements found in § 2G2.2, the Court was "convinced that for a typical downloading case, which this one assuredly is, the applicable guideline . . . cannot be given deference." *Grober*, 595 F. Supp. 2d at 402. As the Majority notes, however, "this is more than a 'typical downloading case.'" Maj. Op. at 9 n.1. Grober admitted sending two e-mails containing eighteen images. This conduct formed the basis for Counts One and Three at which Grober pleaded guilty to transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1). These two offenses—as distinguished from the three counts of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), which *can* properly be deemed "typical downloading" offenses—are properly classified as transportation counts.[4]

---

[4] Because Grober pleaded guilty to transportation offenses, the Majority's reference to the 2009 survey of United States District Court Judges, which found that 70% of judges found the Guidelines for receipt and possession of child pornography too harsh, is inapt. The relevant statistic from this study (assuming its validity) is its finding that 30% of judges think the Guidelines punish distributors too severely. According to this study, the percentage of judges who find that the Guidelines punish the distribution of child pornography too severely is smaller than the percentage of judges who find the Guidelines too severe for: heroin, crack cocaine,

11

Congress considers the transportation of child pornography a particularly egregious crime, and in recent years has expressed its concern that "the development of the Internet and the digital image . . . ha[s] permitted child pornographers to disseminate their product exponentially, not only across America, but around the world, with a few simple strokes of a keyboard." 151 Cong. Rec. 4236 (Feb. 24, 2003); *see also* 151 Cong. Rec. 20221 (2005) (finding that "a substantial interstate market in child pornography exists, including not only a multimillion dollar industry, but also a nationwide network of individuals . . . [who] distribute child pornography with the expectation of receiving other child pornography in return."). As the District Court recognized, Congress imposed a mandatory minimum for transportation offenses based on its finding that "the exchanging through trading images contributes to the growth of child pornography and harms increasing numbers of children." *Grober*, 595 F. Supp. 2d at 404. Given the Court's acknowledgment of the policy reasons supporting Congress's distinction between distributors and possessors, its repeated characterization of Grober as a "typical downloader" whose crimes were those of "consumption" was inexplicably dismissive of Congress's substantial concerns.

The District Court's mischaracterization of this case as a "typical downloading case" is also troubling given the Sentencing Commission's historically dissimilar treatment of possession and distribution offenses.[5] The distinction between

_____

methamphetamine, marijuana, and illegal entry offenses.

[5] In stark contrast to *Kimbrough*—where the Commission found that "the crack/powder sentencing disparity is generally

"simple receipt" and distribution offenses can be traced to the Commission's first set of Guidelines, promulgated in 1987, which included a five-level enhancement for distribution for monetary gain. USSC, *The History of the Child Pornography Guidelines*, 11 (Oct. 2009) [*History of the Guidelines*].[6] After Congress criminalized possession of child pornography in 1991 and the Commission in response thereto proposed USSG § 2G2.4, which grouped together receipt and possession offenses, the Chair of the Sentencing Commission assured Congress that "defendants who *peddle* child pornography will be sentenced as traffickers even if they successfully negotiate a plea to the lesser offense of simple possession of child pornography." *Stabenow* at 7 (citing 137 Cong. Rec. H6736-02, Appendix B). The Chairman's letter stated that this difference in the severity of the crimes "parallels the manner in which illegal drugs (or firearms) receipt and possession are treated similarly under the guidelines, while drug (or firearms) distribution or trafficking are treated more severely."[7] *Id.*

---

unwarranted," 552 U.S. at 97—here, the Commission's finding that distribution is a more severe offense than possession mirrors Congressional findings.

[6] Notably, even *Stabenow* acknowledges that in these "first three years of the Guidelines regime [1987-1990], the provisions of § 2G2.2 were the result of study at the Commission, without obvious outside interference." *Stabenow* at 3 (2008).

[7] Moreover, although a 1991 Congressional amendment, which *Stabenow* discusses in depth, directed the Commission to treat "simple receipt" as a crime to be sentenced under § 2G2.2, rather than § 2G2.4, the amendment made no change to the §

13

The Commission's inclusion of noncommercial bartering of child pornography in its 2000 definition of distribution followed a series of studies confirming the prevalence of bartering, and its harm to children. In its 1990 Report to Congress, the Commission noted that all the trafficking offenses prosecuted up to that date had involved defendants who traded images for pleasure, rather than for pecuniary gain. USSC, *Revised Report of the Working Group on Child Pornography and Obscenity Offenses and Hate Crime*, 17 (1990); *see also* USSC, *Sex Offenses Against Children: Findings and Recommendations Regarding Federal Penalties*, 10 (1996) ("Many cases sentenced under this guideline involve trading clubs or other barter types of exchanges."). The Commission's proposed amendment was published in 1999 and included a five-level enhancement for the distribution of child pornography in exchange for a "thing of value."[8] It received only one substantive public comment: The Federal Public and Community Defenders recognized that "child pornographic

2G2.2 distribution enhancement. There is also no evidence that the Commission's eventual consolidation of § 2G2.2 and § 2G2.4 reflected any Commission opposition to the additional distribution penalty, but rather addressed the Commission's concern that an "unwarranted disparity in sentences" existed for the similar offenses of "simple receipt" and "simple possession." USSC, *Sex Offenses Against Children: Findings and Recommendations Regarding Federal Penalties* at 34 (1996).

[8] A "thing of value" is anything of valuable consideration, *e.g.*, child pornographic material received in exchange for other child pornographic material bartered in consideration for the material received. *See* § 2G2.2, cmt. 1.

material is a 'thing of value' and if received in a bartered exchange for other child pornographic material, an enhancement should apply." *History of the Guidelines* at 34.

Thus, the Commission's harsher treatment of trafficking, and in particular non-pecuniary bartering such as the trading at issue in this case, *was* the product of careful study and public commentary, activities well within the "exercise of [the Commission's] institutional role." *Grober*, 595 F. Supp. 2d at 393 (citing *United States v. Shipley,* 560 F. Supp. 2d 739, 745-46 (S.D. Iowa 2008)). By failing to characterize Grober properly as a distributor of child pornography, the District Court gave little, if any, credence to the institutional expertise of the Commission in developing Guidelines that treat distributors more severely than mere possessors or receivers of child pornography.

Moreover, the Commission's adoption of higher penalties for distribution offenses should be accorded no less deference simply because of the ease with which files can now be traded via e-mail or file sharing networks. Just as we do not treat less severely the use of a firearm during the commission of a robbery or the targeting of an elderly victim, both of which facilitate the crime, so too should we not turn a blind eye to the devastating effect of electronic distribution on the lives of abused children merely because the distributor can inflict his injury by transferring hundreds of files with the stroke of a key. *See United States v. Cunningham*, 680 F. Supp. 2d 844, 853 (N.D. Ohio 2010). In fact, the harsher penalties for online bartering were adopted in part to target at-home traders who contribute considerably to the electronic market for child pornography, believing there to be little chance of detection from law

15

enforcement.

In both its extensive oral decision and its written opinion, the District Court repeatedly referred to this as a "downloading case." Although the District Court referred intermittently to Grober's convictions for transporting child pornography, the record belies any appreciation for the fact that these offenses are qualitatively different and more severe than mere possession. *See Grober*, 595 F. Supp. 2d at 382 ("The crime of conviction in this case is David Grober's downloading of child pornography from the internet."); *id.* at 391 ("The Court denied the government's motion to exclude and later to strike Professor Berman's testimony, because the Court believes it is vital to gain some perspective on the operation of the sentencing guidelines in these downloading cases."); *id.* at 393 ("The Stabenow chart is a one-page devastating commentary on guidelines sentencing in downloading cases."); *id.* ("The Court agrees with the reasoning of Judge Pratt and Judge Adelman that § 2G2.2 leads to a sentence that is too severe in a downloading case."); *id.* at 391 ("[A]s the recent cases show, judges are varying from the guidelines in typical downloading cases when they measure the guidelines against the § 3553(a) factors."); *id.* at 402 ("The Court arrives at this point in the sentencing analysis convinced that for a typical downloading case, which this one assuredly is, the applicable guideline, § 2G2.2, cannot be given deference and produces an unreasonable sentencing range even before considering the sentencing factors in § 3553(a)."); *id.* ("[T]he Court finds that David Grober's case is squarely within the heartland of downloading cases."); *id.* at 410 ("As indicated above, the government's publication 'Federal Prosecution of Child Sex Exploitation Offenders, 2006' states that as of December 2007, the average sentence for the

16

downloading defendant is 63 months. From this same report comes the information that David Grober is a very typical downloading defendant.").

The foregoing quotations demonstrate that the District Court's references to "downloading" were not merely a "form a shorthand," Maj. Op. at 9 fn.2. Rather, they evidence a fundamental misapprehension of Grober's crimes. This constitutes reversible error. [9]

## D.

Finally, the District Court's wholesale rejection of § 2G2.2 throws the wheat out with the chaff. I have no quarrel with the concerns expressed by the District Court regarding the draconian nature of Grober's Guidelines range and the fact that the enhancements for use of a computer (USSG § 2G2.2(b)(6)) and pre-pubescent minors (USSG § 2G2.2(b)(2)) would put Grober into a category with 95% of those convicted of child pornography offenses. But the District Court was wrong to ignore: (1) the fact that Grober's collection contained material portraying sadistic and masochistic conduct (USSG § 2G2.2(b)(4)); (2) that Grober distributed child pornography for the receipt, or expectation of receipt, of a thing of value (USSG

---

[9] Although the Majority correctly notes that "Grober is not in any sense a large-scale distributor," Maj. Op. at 9 fn.2, it points to no evidence that Congress intended receipt and transportation crimes to apply only to large-scale enterprises. Rather, Congress intended the increased penalties associated with these crimes to apply to small-scale, home-based distributors such as Grober. 151 Cong. Rec. 20221 (2005).

17

§ 2G2.2(b)(3)(B); and (3) that Grober possessed well over 600 images (USSG § 2G2.2(b)(7)(D)). While the District Court was free to evaluate these facts pursuant to 18 U.S.C. § 3553(a), it was not permitted to disregard them entirely.

At least three of our sister courts of appeals have noted the trend towards granting downward variances in cases involving § 2G2.2. *See, e.g.*, *U.S. v. Morace*, 594 F.3d 340, 346-47 (4th Cir. 2010); *U.S. v. Stall*, 581 F.3d 276, 284 n.2 (6th Cir. 2009); *U.S. v. Huffstatler*, 571 F.3d 620, 622-23 (7th Cir. 2009). Grober's sentence is problematic, however, because instead of assessing all of the relevant facts of Grober's case as part of its § 3553(a) analysis—including those facts that happen to be embodied in § 2G2.2 enhancements—the District Court rejected § 2G2.2 *in toto*. Having unmoored itself entirely from this Guideline, the District Court begins (and ends) its evaluation of the § 3553(a) factors by fixating on the five-year statutory minimum. Consequently, the District Court's variance was both inadequately justified and, at least in part, based on clearly erroneous facts, to wit: Grober was a "typical downloader," his collection was not "egregiously large," and Agent Chase was not qualified "to distinguish between 'bad' child pornography and 'really bad' child pornography," *Grober*, 595 F. Supp. 2d at 401. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

A survey of other district courts that have evaluated § 2G2.2 demonstrates the nature of the District Court's error here. While it is true that district courts have varied downward from the Guidelines range—and sometimes substantially so—they still considered case-specific facts underlying § 2G2.2 enhancements; they did not entirely disregard those facts along

with the Guideline.  *See, e.g.*, *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1107 (N.D. Iowa 2009) ("[A] reasoned alternative to the flawed guideline is for the sentencing judge to begin with the base offense level, which reflects the mandatory minimum statutory sentence, U.S.S.G. § 2G2.2(a), and then to consider appropriately identified factors, such as those in § 2G2.2(b)(1), (3), (4), and (5), but to give those factors more appropriate weight in the determination of a particular defendant's sentence.  Such 'cherry picking' and reweighing of factors from the guideline is appropriate—indeed, totally consistent with the exercise of my discretion to apply the 18 U.S.C. § 3553(a) factors."); *United States v. Jacob*, 631 F. Supp. 2d 1099, 1108 (N.D. Iowa 2009) ("While I reject the extent of the enhancements based on these considerations [of specific aggravating factors] in § 2G2.2 and § 2G2.1, I find that some enhancement of the defendant Jacob's non-guideline sentence above the mandatory minimum is appropriate based on these considerations."); *cf. United States v. Burns*, 2009 WL 3617448, *7–*8 (N.D. Ill. 2009) ("Here, the court declines to disregard the Guidelines entirely and instead adapts them by beginning with the base offense level (as it reflects a statutory minimum) and then rejecting enhancements that the court determines exact punishment that is duplicative of the underlying offense, or do not otherwise effectively serve to distinguish less from more culpable conduct.  On the other hand, the court will apply an enhancement or downward adjustment where it finds such an adjustment appropriate based on Burns's relevant individual characteristics or other factors outlined in 18 U.S.C. § 3553(a).").

Each of the aforementioned courts determined that certain § 2G2.2 factors—*e.g.*, the number of the images, the

sadism or masochism depicted in the images, the defendant's distributing activities—warranted a sentence above the statutory minimum. *See Burns*, 2009 WL 3617448 at *13, *16 (incorporating a five-point "pattern of . . . exploitation" enhancement as basis for a 72-month sentence); *Beiermann*, 599 F. Supp. 2d at 1107, 1117–18 (sentencing defendant to 90 months after "reweighing" and "cherry picking" Guidelines factors); *Jacob*, 631 F. Supp. 2d at 1108 (reweighing the sadistic, masochistic, or violent content and the distribution factors as a basis for a 78-month sentence on transportation count); *see also United States v. Cunningham*, 680 F. Supp. 2d 844, 853, 862 (N.D. Ohio 2010) (accepting § 2G2.2 and imposing a within-Guidelines range sentence of 121 months); *United States v. McElheney*, 630 F. Supp. 2d 886, 904 (E.D. Tenn. 2009) (imposing a 78-month sentence because based on the size and sadistic nature of the defendant's collection and the prepubescent victims, "the Court cannot conclude he is among the least culpable of child pornography offenders"); *United States v. Noe*, 2009 WL 3836707, *7 (D. Neb. 2009) (granting variance but imposing an 84 month sentence rather than statutory minimum); *United States v. Johnson*, 588 F. Supp. 2d 997, 1005 (S.D. Iowa 2008) (considering the "number and nature of the underlying photographs" as basis for an 84-month sentence); *United States v. Noxon*, 2008 WL 4758583, *3 (D. Kan. 2008) (considering, in part, the defendant's distribution activities as basis for a 144-month sentence).

The two judges most heavily cited by the District Court followed the procedure I just outlined. Judge Adelman in *United States v. Hanson* considered the facts relevant to § 2G2.2 enhancements in arriving at a 72-month sentence for transportation and receipt of child pornography, stating: "In

order to acknowledge some of the aggravating factors in this case, such as number and type of images, and to insure just punishment, I did not impose a sentence at the minimum, as defendant requested. The minimum should be reserved for the most mitigated of cases."  561 F. Supp. 2d 1004, 1012 (E.D. Wis. 2008).  Likewise, Judge Pratt in *United States v. Shipley* accounted for the "horrific nature of some of the images" as well as the defendant's role as a distributor in "actively and consistently perpetuating the market for this material" as bases for a 90-month sentence for receipt of child pornography.  560 F. Supp. 2d 739, 745-46 (S.D. Iowa 2008).

The District Court's wholesale rejection of all things related to § 2G2.2—including even the legitimate concerns at the heart of each enhancement—is quite atypical.  In cases like Grober's, most courts that have imposed substantial downward variances have given some weight to those aggravating factors enunciated in § 2G2.2 as part of their § 3553(a) analyses. Regardless of the validity of the District Court's general policy argument against § 2G2.2 enhancements as they fit within the Guidelines scheme, the Court in this case erred in its § 3553(a) analysis by minimizing and sidestepping significant facts about Grober's crime, seemingly in protest of the draconian nature of § 2G2.2 as a whole.  *See Arrelucea*, 581 F.3d at 151, 156 (noting that it is a "judicial function to sentence defendants based on the facts and circumstances of each case under the guidance of the § 3553(a) factors").

The District Court's nullification of § 2G2.2 influenced its curt discussion of the "nature and circumstances of the offense," which comprises a mere three paragraphs, in contrast to its ten-paragraph discussion of the "history and characteristics

21

of the defendant." *Grober*, 595 F. Supp. 2d at 404-408. Within the "nature and circumstances of the offense" discussion, the District Court brushes aside the size and content of Grober's child pornography collection (over 1500 pictures and 200 videos) without any mention of Special Agent Chase's testimony that this was the second largest collection out of 180 she had analyzed in her four-year career and that it included "more children . . . involved in actual sexual activity, as opposed to posing, than appeared in other collections she analyzed." *Id.* at 400, 404.[10]  Even if the § 2G2.2 enhancements for 600 images, prepubescent children, and masochistic content apply in most cases and are therefore deserving of less weight than that which the Guidelines affix to them, surely the enormity and offensive nature of Grober's collection is relevant enough to the "nature and circumstances of the offense" to deserve more than two dismissive sentences.[11]  *See id.* at 404 ("The Court also is

---

[10] Like the District Court, the Majority minimizes Grober's transportation crimes by noting the small number of images he distributed.  Conversely, they fail to consider the quantity and nature of the images in Grober's collection in their analyses of the nature and circumstances of his crime of possession.

[11] The Majority asserts that because "many of [§ 2G2.2's] enhancements apply in almost all cases," these enhancements are in fact built-in to the original offense.  *See* Majority Op. at 19 (citing *United States v. Dorvee*, 604 F.3d 84 (2d Cir. 2010) (noting that 97.2% of child pornography cases in 2009 involved images of prepubescent minors and 97.2% involved the use of a computer)).  But the Majority does not justify the District Court's disregard for those enhancements that apply only 73.4%

22

not convinced that Grober's child pornography collection is egregiously large. He viewed a large amount of pornography over three years, he hoarded images, and he kept his images sloppily mixed in with other, legal files.").

The District Court's similarly dismissive treatment of Grober's status as a distributor rather than a mere possessor has already been discussed at length, but warrants mention again here because this mischaracterization further tainted the Court's § 3553(a) analysis of the nature of the crime. *See id.* ("The nature and circumstances of his offense are at the core related to consumption.").

In sum, even if it were proper to accept in its entirety the District Court's policy disagreement with § 2G2.2, the extent to which it failed to account for significant facts that underlie § 2G2.2 enhancements reflects a deeply flawed analysis of the § 3553(a) factors. This "fail[ure] to adequately explain the chosen sentence" and reliance on a number of "clearly erroneous facts" requires vacatur and remand.

---

and 63.1% of the time (offenses involving images of sadistic, masochistic, or otherwise violent conduct, and offenses involving over 600 images, respectively). Given that 26.6% of cases do not involve images of violence and 36.9% involve fewer than 600 images, the fact that Grober's collection was both greater than 600 and included violent images demonstrates beyond peradventure that his was not one of the "most mitigated of cases." *See United States v. Hanson*, 561 F.Supp.2d at 1012.

## III.

As I noted at the outset, the District Court labored mightily to impose a just sentence upon David Grober. That effort was animated by a candid fear that Congress's zeal to address the proliferation of child pornography has resulted in penalties grossly disproportionate to the culpability attendant to this type of crime. Even accepting that premise, it is still wrong for a sentencing court to: (1) categorically reject the validity of a Guideline by impugning generally the plea bargaining system; (2) punish a party for failing to present "evidence" it never should have presented in the first place; (3) mischaracterize a defendant's crimes of conviction; and (4) use a categorical rejection of a Guideline as a proxy for ignoring some of the relevant § 3553(a) factors. Because each of these errors is manifest on this record, I would vacate Grober's judgment of sentence and remand for a new sentencing hearing.